# United States District Court
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| E-SYSTEM DESIGN, INC. | § |
| | § Civil Action No. 4:17-CV-00682 |
| v. | § Judge Mazzant |
| | § |
| MENTOR GRAPHICS CORPORATION | § |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Mentor Graphics Corporation's ("Mentor") Motion to Dismiss for Lack of Standing (Dkt. #9). After reviewing the relevant pleadings and motion, the Court finds that the motion should be denied.

## BACKGROUND

This is a suit about a patent licensee suing for patent infringement. On January 14, 2008, the patent licensor—Georgia Tech Research Company ("Georgia Tech")—executed a licensing agreement (the "Original License Agreement") with the patent licensee—Plaintiff E-System Design ("E-System") (Dkt. #9 at p. 6). The Original License Agreement granted "an exclusive license" to E-System for technology in U.S. Patent Application No. 11/888,705 (the "Patent Application") that later included United States Patent No. 8,352,232 (the "'232 Patent") (Dkt. #1 at p. 4; Dkt. #9, Exhibit 1 at pp. 2–3; Dkt. #9, Exhibit 2 at p. 2; Dkt. #9, Exhibit 6 at p. 2). Thereafter, E-System and Georgia Tech amended the Original License Agreement five times (collectively, "the Agreements"). Amendment No. 5 to the Original License Agreement ("Amendment No. 5"), however, most impacts this Order's analysis.

Executed on March 24, 2015, Amendment No. 5 gave E-System (1) the sole discretion to grant royalty-free sublicenses of the '232 Patent; (2) obliged E-System to pay Georgia Tech a

portion of any one-time, lump sum received for sublicensing the '232 Patent; (3) relieved E-System from paying royalties for any "Net Sales" of products alleged to embody the '232 patent; and (4) gave E-System the sole and exclusive right to sue Mentor for infringement of the '232 Patent and all other purported infringers as long as E-System satisfied certain conditions (Dkt. #9, Exhibit 6).

On September 27, 2017, E-System sued Mentor for patent infringement, alleging that Mentor had been infringing on the '232 Patent "since at least 2013." (Dkt. #1 at p. 8). On December 11, 2017, Mentor filed a Motion to Dismiss for Lack of Standing (Dkt. #9). On January 8, 2018, E-System responded (Dkt. #14). On January 23, 2018, Mentor replied (Dkt. #20). On January 30, 2018, E-System filed its sur-reply (Dkt. #24).

## LEGAL STANDARD

Standing is a threshold subject matter jurisdictional requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60 (1992). Plaintiff has the burden of demonstrating standing. *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003). Standing must be present when the plaintiff brings suit, and cannot be cured retroactively. *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010). A plaintiff must be a patentee or a licensee who holds "all substantial rights in the patent" to have standing. *H.R. Techs., Inc. v. Astechnologies, Inc.*, 275 F.3d 1375, 1384 (Fed. Cir. 2002) (quotations omitted). A court can assess subject matter jurisdiction and the issue of standing at any time. FED. R. CIV. P. 12. Each element for standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

> If a defendant makes a "factual attack" upon the court's subject matter jurisdiction over the lawsuit, the defendant submits affidavits, testimony, or other evidentiary

materials. In the latter case a plaintiff is also required to submit facts through some evidentiary method and has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction.

*Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981)). "A motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). When evaluating patent standing, courts consider a party's prudential standing and constitutional standing. *Mosaid Techs. Inc. v. Freescale Semiconductor, Inc.*, 2012 WL 12903081 at *2 (E.D. Tex. May 14, 2012)

## ANALYSIS

### I.    E-System Has Prudential Standing

Mentor argues that E-System does not have sufficient rights in the '232 Patent to have prudential standing. E-System counters that the Agreements grant E-System sufficient rights to the '232 Patent needed for prudential standing.

A patent "is, in effect, a bundle of rights which may be divided and assigned, or retained in whole or part." *Alfred E. Mann Found. for Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1360 (Fed. Cir. 2010) (citation omitted). "When a sufficiently large portion of this bundle of rights is held by one individual, we refer to that individual as the owner of the patent, and that individual [has prudential standing] to sue for infringement in his own name." *Id.* In turn, "[a] patent owner may transfer *all substantial rights* in the patents-in-suit, in which case the transfer is tantamount to an assignment of those patents to the exclusive licensee, conferring standing to sue solely on the licensee." *Id.* at 1358–59 (emphasis added).

When assessing whether a party has "all substantial rights in the patents-in-suit," courts often consider several indicia of ownership (the "*Alfred* Factors"). *Diamond Coatings Techs., LLC v. Hyundai Motor Am.*, 823 F.3d 615, 619 (Fed. Cir. 2016); *Alfred*, 604 F.3d at 1360–61. "'[T]he nature and scope of the [patentee's] retained right to sue accused infringers [and license the patent are] the most important factor[s] in determining whether an [agreement] . . . transfers sufficient rights to render the [other party] the owner of the patent.'" *Diamond Coatings*, 823 F.3d at 619 (quoting *Alfred*, 604 F.3d at 1360–61). Next, "transfer of the exclusive right to make, use, and sell products or services under the patent is *vitally important* to the assignment." *Alfred*, 604 F.3d at 1360 (emphasis added); *Diamond Coatings*, 823 F.3d at 619. Under the remaining *Alfred* Factors, courts also consider

> the scope of the licensee's right to sublicense, the nature of license provisions regarding the reversion of rights to the licensor following breaches of the license agreement, the right of the licensor to receive a portion of the recovery in infringement suits brought by the licensee, the duration of the license rights granted to the licensee, the ability of the licensor to supervise and control the licensee's activities, the obligation of the licensor to continue paying patent maintenance fees, and the nature of any limits on the licensee's right to assign its interest in the patent.

*Alfred*, 604 F.3d at 1360–61. The Court will address each of the *Alfred* Factors in turn.

**A. The Nature and Scope of Georgia Tech's Right to Enforce and License the '232 Patent Support E-System's Prudential Standing**

Mentor argues that Georgia Tech reserved the right to sue entities other than Mentor for infringement "so long as [E-System] is not selling or offering to sell a product embodying or alleged to embody one or more claims of the '232 Patent." (Dkt. #9 at pp. 12–13). Mentor claims that E-System lacks the right to sue all infringers of the '232 Patent due to these termination conditions and only has the right to sue Mentor. Mentor contends that if the Court allows E-System to sue Mentor now and E-System later stops selling or offering to sell a product embodying or

alleged to embody the '232 Patent, E-System would lose its exclusive right to sue. Mentor advances that Georgia Tech would then be able to also sue Mentor "in contradiction to the underlying goal of requiring a licensee to join the patentee in a suit." (Dkt. #20 at p. 4). E-System argues that its right to sue for infringement is not subverted by being liable to subsequent conditions in Amendment No. 5. E-System further asserts that even if it lost the exclusive right to sue parties other than Mentor in the future, E-System would still have the sole right to sue those parties for damages due to infringing activities during the effective date of Amendment No. 5 up to the date of the hypothetical termination of its right to sue such parties. In turn, E-System argues that two parties could never sue Mentor for the same infringing conduct.

"[A] transfer does not lose its character as an assignment simply because it is liable to be defeated by [non-performance] of a condition subsequent." *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1132 (Fed. Cir. 1995). Rather, "termination provisions in the agreements [are] entirely consistent with an assignment. An assignment of a patent 'may be either absolute, or by way of mortgage and liable to be defeated by non-performance of a condition subsequent. . . .'" *Vaupel Textilemaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed. Cir. 1991) (quoting *Waterman v. Mackenzie*, 138 U.S. 252, 256 (1891)).

Amendment No. 5 gave E-System the "sole and exclusive right to sue [Mentor], as well as its successors and assigns, for infringement of the '232 Patent." (Dkt. #14, Exhibit 6 at p. 3). Amendment No. 5 also gave E-System the "sole and exclusive right to sue entities other than [Mentor] for infringement of the '232 Patent for so long as [E-System] is selling or offering to sell a Product embodying or alleged to embody one or more claims of the '232 Patent." (Dkt. #14, Exhibit 6 at p. 3). These termination conditions do not subvert Plaintiff's right to sue

Mentor and all other parties suspected of infringing the '232 Patent. In turn, E-System alone has the right to sue for infringement of the '232 Patent. With regard to the right to license the '232 Patent, E-System received an exclusive license to the '232 Patent, can only lose that exclusive license through an uncured, material breach of the Agreements, and has the sole right to sublicense under the Agreements. *Supra* at 1–2; *Infra* at 7–8; (Dkt. #9, Exhibit 1 at p. 13). The conditions subsequent governing E-System's exclusive license of the '232 Patent do not subvert E-System's right to that exclusive license for purposes of this analysis. *Vaupel*, 944 F.2d at 875. "In sum, [E-System's] exclusive right to sue, exclusive license, and freedom to sublicense are factors that strongly suggest that the Agreement constitutes an effective assignment [of the '232 Patent]." *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1344 (Fed. Cir. 2014), *vacated on other grounds*, 135 S. Ct. 1846, 181 L. Ed. 2d 720 (2015). Thus, the "most important factor[s]" concerning the rights to enforce and to license the '232 Patent support E-System's prudential standing. *Diamond Coatings*, 823 F.3d at 619 (quoting *Alfred*, 604 F.3d at 1360–61).

    **B. The "Vitally Important" Right to Make, Use, and Sell Products Under the '232 Patent Supports E-System's Prudential Standing**

Relying on *AsymmetRx, Inc. v. Biocare Medical, LLC*, Mentor argues that Georgia Tech's retained right to make and use the '232 Patent for "education and research and development . . . but not for any commercial use" means Georgia Tech did not grant all substantial rights in the '232 Patent to E-System. (Dkt. #9 at p. 16); 582 F.3d 1314, 1320 (Fed. Cir. 2009). E-System counters that Georgia Tech's "very limited license to use the technology for educational and research purposes only is unrelated to this factor, which focuses on the right to actually make, use, and sell the products under the patent." (Dkt. #14 at p. 17).

6

In *Biocare*, the licensing university retained the right to use the patent for academic research along with several other rights, including, most critically, a right of first refusal in suing alleged infringers and the right to sue infringers if the licensee chose not to do so. *Biocare*, 582 F.3d at 1320–21. Considering these rights in aggregate, the Federal Circuit found that the university "retained substantial control over the patent rights it was exclusively licensing, such that the agreement with [the licensee] did not convey all substantial rights. . . ." *Id.* at 1321. Consequently, *Biocare* is factually distinct from this matter.

Additionally, the Federal Circuit identified this factor as the right to "make, use, *and* sell products or services under the patent." *Alfred*, 604 F.3d at 1360 (emphasis added). The conjunction indicates that the right encompasses three, distinct activities. *See Guam Indus. Servs., Inc. v. Rumsfeld*, 383 F. Supp. 2d 112, 119 n.5 (D.D.C. 2005) ("[T]he conjunctive 'and' directs that the item preceding it and that succeeding it be different . . . [h]ad the drafter intended for the two to be the same, a set of parentheses, or even an a.k.a., would have been apropos."). Georgia Tech had the right to make and use the '232 Patent under the Original License Agreement but not the right to make, use, *and* sell products and services under the patent (Dkt. #9, Exhibit 1 at p. 3). Consequently, Georgia Tech's right is distinct from the right identified by the Federal Circuit. Thus, the "vitally important" right to make, use, and sell the '232 Patent supports E-System's prudential standing. *Alfred*, 604 F.3d at 1360.

**C. The Scope of the Licensee's Right to Sublicense**

E-System argues that it "may, at its sole discretion, grant royalty-free sublicenses to the '232 Patent" under Amendment No. 5 (Dkt. #14 at p. 18) (quotations omitted). E-System further claims that it can sublicense the '232 Patent without notifying Georgia Tech and without receiving

7

its consent. Mentor counters that Georgia Tech has a right to a percentage of sales due to E-System's sublicense of the '232 Patent (Dkt. #9 at p. 7).

Amendment No. 5 indeed explains that "[E-System] may, at its sole discretion, grant royalty-free sublicenses to the '232 Patent." (Dkt. #14, Exhibit 6 at p. 2). In turn, a plain reading of Amendment No. 5 shows that E-System has the right to sublicense. Thus, this *Alfred* Factor supports E-System's prudential standing.

### D. The Nature of License Provisions Regarding the Reversion of Rights to the Licensor Following Breaches of the License Agreement

Mentor asserts that Georgia Tech held certain reversionary rights to the '232 Patent tied to performance benchmarks—i.e. strategic and financial goals for developing and marketing the '232 Patent—in Addendum A of the Original License Agreement.[1] E-System counters that it met all of Addendum A's performance benchmarks. E-System argues that even if it had not met any benchmarks, Georgia Tech still entered into Amendment No. 3, Amendment No. 4, and Amendment No. 5 to the Original License Agreement after expiration of the final benchmark on January 14, 2011. E-System declares that these Amendments served to expand E-System's "exclusive rights" to the '232 Patent (Dkt. #14 at p. 19).

A licensor's power to terminate a licensing agreement and end a licensee's right in a patent for failure to meet specified benchmarks, "although not dispositive, is yet another indication that [the licensor] retains a significant ownership interest in the patent." *Propat Int'l Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1191–92 (Fed. Cir. 2007). Though Mentor does not contest that E-System met the benchmarks, the Original License Agreement still burdened E-System with performance

---

[1] The Court has already discussed the purported reversion of the right to sue for infringement of the '232 Patent. *Supra* at 4–6.

benchmarks through which Mentor had reversionary rights (Dkt. #9, Exhibit 1 at p. 8). Thus, this *Alfred* Factor does not support E-System's prudential standing.

E.  **The Right of the Licensor to Receive a Portion of the Recovery in Infringement Suits Brought by the Licensee**

E-System avers that by paying the $100,000 "Buy-Out Fee" to Georgia Tech it barred Georgia Tech's right to proceeds from litigating or licensing the '232 Patent (Dkt. #14 at p. 19). Mentor counters that "the general purpose of a [Buy-Out Clause] . . . is to eliminate a licensee's obligation to pay royalties in a continuing nature." (Dkt. #20 at p. 7).

Review of the language following the Buy-Out Clause in Amendment No. 5 shows that it did not discuss proceeds from litigation (Dkt. #16, Exhibit 6 at pp. 1–2). Amendment No. 5 does, however, grant E-System the sole and exclusive right to sue patent infringers (Dkt. #14, Exhibit 6 at p. 3). Meanwhile, the Original License Agreement stipulates that "[t]he party choosing to enforce [Georgia Tech's] Intellectual Property Rights may then proceed with such enforcement action solely at its own expense and any and all recoveries shall be awarded solely and exclusively to that party." (Dkt. #14, Exhibit 1 at p. 11). Reading the Original License Agreement and Amendment No. 5 together, Georgia Tech has no right to recover proceeds from infringement suits prosecuted by E-System. Thus, this *Alfred* Factor supports E-System's prudential standing.

F.  **The Duration of the License Rights Granted to the Licensee**

E-System argues that its possession of an exclusive, royalty-free license for the life of the '232 Patent supports prudential standing under this *Alfred* Factor. Mentor does not contest this claim. The Original License Agreement continues "until the expiration of the last expiring patent covering any of the Technology licensed hereunder." (Dkt. #9, Exhibit 1 at pp. 12–13). Such "[t]echnology" encompasses the '232 Patent (Dkt. #1 at p. 4; Dkt. #9, Exhibit 1 at p. 2; Dkt. #9,

9

Exhibit 2 at p. 2; Dkt. #9, Exhibit 6 at p. 2). Thus, the duration of E-System's rights as the licensee supports E-System's prudential standing.

### G. The Ability of the Licensor to Supervise and Control the Licensee's Activities

E-System contends that Georgia Tech has no right to supervise or control E-System's activities involving the '232 Patent, indicating prudential standing under this *Alfred* Factor. E-System further asserts that by paying the "Buy-Out Fee," E-System received the remaining substantial rights from Georgia Tech that it did not already hold (Dkt. #14 at p. 12). E-System accordingly argues that "[E-System's] payment of the Buy-Out Fee extinguished any supervisory role [Georgia Tech] arguably maintained." (Dkt. #14 at p. 20). Mentor counters that the Buy-Out Clause in Amendment No. 5 does not grant E-System the remaining substantial rights. Rather, Mentor contends that the Buy-Out Fee manifests E-System's and Georgia Tech's "desire to eliminate [E-System's] obligations to pay royalties and lump sum payments under the Agreement. . . ." (Dkt. #20 at p. 7) (quotations omitted).

The Original License Agreement burdens E-System with several legal obligations prescribed by Georgia Tech, including license fees, performance benchmarks, and confidentiality procedures (Dkt. #9, Exhibit 1 at pp. 4, 6–8). While E-System bears several obligations under the Original License Agreement, Georgia Tech most notably retains supervision over E-System's activities as a licensee by requiring Georgia Tech's approval for assignment of the license (Dkt. #9, Exhibit 1 at p. 14). Payment of the Buy-Out Fee, however, relieved E-System of the burden to pay various royalties to Georgia Tech, let E-System grant royalty-free sublicenses at its discretion, and gave E-System the sole right to sue for infringement of the '232 Patent (Dkt. #14, Exhibit 6 at pp. 1–2). In turn, Georgia Tech does not extensively supervise or control

E-System's activities as a licensee. Thus, this *Alfred* Factor supports E-System's prudential standing.

### H. The Obligation of the Licensor to Continue Paying Patent Maintenance Fees

E-System asserts that it "maintains the responsibility" for all fees and expenses associated with maintaining the '232 Patent (Dkt. #14 at p. 20). E-System advances that it reimbursed Georgia Tech for all preparation and filing expenses when E-System first secured rights in the "provisional [patent] application leading to the '232 Patent." (Dkt. #14 at p. 20). E-System next claims to have paid all fees and expenses involved in converting the "provisional [patent] application into a non-provisional [patent] application." (Dkt. #14 at p. 20). E-System also contends that it "prosecut[ed] that [non-provisional] application." (Dkt. #14 at p. 20). Lastly, E-System avers that it is responsible for all future maintenance fees associated with the '232 Patent for the life of the '232 Patent. Mentor does not deny these arguments.

Under Amendment No. 1, E-System agreed to "assume full responsibility for the patent prosecution process and assume all ongoing costs, fees and expenses [associated with the Patent Application and the '232 Patent]." (Dkt. #14, Exhibit 2 at p. 3). In turn, E-System is obliged to pay patent maintenance fees and this *Alfred* Factor favors E-System's prudential standing.

### I. The Nature of Any Limits on the Licensee's Right to Assign Its Interest in the Patent.

E-System advances that it has the right to assign the license with "the sale of substantially all of the business or assets of the product line using the ['232 Patent]" or "by obtaining [Georgia Tech's] consent." (Dkt. #14 at p. 21) (footnote omitted) (quotations omitted). E-System contends that if Georgia Tech were to withhold consent to E-System's assignment of its rights to the '232 Patent, E-System could still sublicense all of its rights to the '232 Patent to any transferee it likes.

Mentor argues that E-System cannot circumvent the Agreements' explicit assignment consent requirement by transferring all of its interest in a sublicense. Mentor asserts that E-System's interpretation of the sublicensing provisions in Amendment No. 5 is so broad as to render the assignment provision in the Original License Agreement irrelevant. Finally, Mentor claims that E-System's lack of the right to assign the license does not support E-System's prudential standing.

The Federal Circuit recognizes limitations of a licensee's right to assign as "a factor weighing in favor of finding a transfer of fewer than all substantial rights . . . ." *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001). Since there was a limitation on E-System's right to assign, this *Alfred* Factor does not support prudential standing but does not alter the result of the Court's analysis.

Contrary to Mentor's briefing, this limitation is neither dispositive nor vitally important. *Alfred*, 604 F.3d at 1360–61. In *Abbott*[2] and *Sicom Systems, Ltd. v. Agilent Technologies, Inc.*[3], for example, the Federal Circuit held that the licensees did not have prudential standing because

---

[2] In *Abbott*, the Federal Circuit found that the licensee had no prudential standing because the licensor retained, "the right to make and use, for its own benefit, products embodying the inventions claimed in the patents, as well as the right to sell such products to end users, to parties with whom [the licensor] had pre-existing contracts, and to pre-existing licensees." *Abbott*, 47 F.3d at 1132. The Federal Circuit also noted that "if [the licensor] asks [the licensee] to bring suit against an alleged infringer and [the licensee] declines to do so, [the licensor] has the right to prosecute its own infringement action. . . ." *Id.* The Federal Circuit concluded that "although [the licensee] has the option to initiate suit for infringement, it does not enjoy the right to indulge infringements, which normally accompanies a complete conveyance of the right to sue." *Id.* The license agreement also mandated that the licensee could not "prejudice or impair the patent rights in connection with such prosecution or settlement." *Id.* Finally, the license agreement provided that the licensor was "entitled to be represented [in any patent enforcement proceeding] by counsel of its own selection at its own expense." *Id.* (quotations omitted).

[3] In *Sicom*, the Federal Circuit found that the licensee lacked prudential standing because it did not have: "the right to settle litigation without prior written consent from [the licensor]" or "the right to sublicense without [the licensor's] prior approval or to assign its rights." 427 F.3d at 979. The Federal Circuit also found that the licensee lacked prudential standing because the licensor retained the right to "[(1)] grant contracts and sub-contracts to develop [the patent] further; [(2)] offer sublicenses under any improvements or corrections that [the licensee] develops; [(3)] veto any sublicense; and [(4)] levy additional royalties or other consideration." *Id.*

the licensees lacked several substantial rights, not solely because they did not have the right to assign their patents.

**E-System Has "All Substantial Rights" Needed for Prudential Standing**

E-System satisfies the "most important factor[s]" concerning the right to enforce and license the '232 Patent, the "vitally important" right to make, use, and sell products embodying the '232 Patent, and five of the seven rights in the remaining *Alfred* Factors as argued by the parties. In turn, the Court finds that the Agreements convey to E-System "all substantial rights" to the '232 Patent, and any rights retained or granted to Georgia Tech under the Agreements are not sufficient to divest E-System of "all substantial rights" under the '232 Patent. Therefore, the Court finds that E-System has prudential standing.

## II.    E-System Has Constitutional Standing

Mentor appears to argue that E-System also lacks constitutional standing by lacking "all substantial rights" to the '232 Patent (Dkt. #9 at p. 11). E-System again counters that it holds "all substantial rights" to the '232 Patent.

Constitutional standing requires "only that a plaintiff must have suffered an injury in fact, that there be a causal connection between the injury and a defendant's conduct, and that the injury be redressable by a favorable court decision." *Evident Corp. v. Church & Dwight Co., Inc.*, 399 F.3d 1310, 1313 (Fed. Cir. 2005). To establish an "injury in fact," the plaintiff must show that the alleged infringer invaded a legally protected interest which is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Mosaid Techs. Inc.*, 2012 WL 12903081 at *2 (quoting *Lujan*, 504 U.S. at 560 (internal quotations omitted)). "Article III standing to sue in [patent cases] derives solely from the Patent Act." *Intellectual Prop. Dev., Inc.*,

248 F.3d at 1346. "A patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. A patentee encompasses "'not only the patentee to whom the patent issued but also the successors in title to the patentee.'" *Mosaid Techs. Inc.*, 2012 WL 12903081 at *2 (quoting *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1340 (Fed. Cir. 2006)). "[I]f a patentee transfers 'all substantial rights' to the patent, this amounts to an assignment or transfer of title, which confers constitutional standing on the assignee to sue for infringement in its own name alone." *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007) (footnote omitted) (quoting *Intellectual Prop. Dev.*, 248 F.3d at 1345).

Since Georgia Tech transferred "all substantial rights" to E-System in the Agreements, E-System has constitutional standing to sue for infringement "in its own name alone." *Morrow*, 499 F.3d at 1340. E-System contends that Mentor's ongoing infringement of the '232 Patent constitutes an injury in fact to E-System that is redressable in the Court (Dkt. #1 at pp. 7–11). Mentor's purported infringement inflicts a legal injury because E-System has the right to sue infringers, E-System is contractually entitled to damages from infringement, and E-System has the right to sublicense the '232 Patent to Mentor. *See Mosaid Techs. Inc.*, 2012 WL 12903081 at *3. In turn, the Court finds that E-System has constitutional standing to sue for Mentor's alleged infringement of the '232 Patent.

## CONCLUSION

After reviewing the parties' briefing, the Court finds that E-System has prudential standing and constitutional standing to pursue its patent infringement claim against Mentor. It is therefore **ORDERED** that Defendant Mentor Graphics Corporation's Motion to Dismiss for Lack of Standing (Dkt. #9) is hereby **DENIED**.

**SIGNED** this 4th day of April, 2018.

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE