**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| E-SYSTEM DESIGN, INC. a Delaware corporation, | |
| *Plaintiff*, | Civil Action No. 4:17-cv-00682-ALM |
| v. | **JURY TRIAL DEMANDED** |
| MENTOR GRAPHICS CORP., an Oregon corporation, | |
| *Defendant*. | |

<u>**DEFENDANT MENTOR GRAPHICS CORPORATION'S
RESPONSIVE CLAIM CONSTRUCTION BRIEF**</u>

# <u>TABLE OF CONTENTS</u>

Page

I.   ESD VIOLATES THE COURT'S RULES AND INVITES LEGAL ERROR ................. 1

    A.   The Court Should Strike ESD's Extrinsic Evidence................................................. 1

    B.   The Court Should Strike ESD's "Alternative Constructions" ................................ 2

    C.   It Is The Court's Exclusive Duty To Construe The Claims For The Jury ............. 2

    D.   The Court Must Ensure Each Juror Understands The Correct Meaning ................ 4

II.  THE FOURTH ELEMENT IS INTERNALLY INCONSISTENT, INCONSISTENT WITH THE SPECIFICATION, NONSENSICAL, AND THUS INDEFINITE................ 5

III. CLAIM CONSTRUCTIONS........................................................................................... 13

    A.   "basis function(s)" ................................................................................................ 14

    B.   "constructed on cylindrical coordinates" ............................................................. 15

    C.   "current density distribution" and "charge density distribution".......................... 17

    D.   "cylindrical accumulation mode basis functions".................................................. 19

    E.   linearly combine(s) selected cylindrical conduction mode basis functions to approximate a current density distribution over a cross section of a cylindrical conductor................................................................ 21

    F.   "constructs equivalent circuit equations".............................................................. 23

    G.   "construct an equivalent resistance, inductance, conductance, capacitance (RLGC) circuit"................................................................................... 24

IV.  MENTOR DOES NOT INFRINGE .............................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

*Akamai Techs. Inc. v. Limelight Networks, Inc.*,
805 F.3d 1368 (Fed. Cir. 2015)...................................................................... 5

*Artis v. District of Columbia*,
138 S. Ct. 594 (2018).................................................................................... 16

*Competitive Techs., Inc. v. Fujitsu Ltd.*,
185 F. App'x 958 (Fed. Cir. 2006) ................................................................. 7

*Datamize, LLC v. Plumtree Software, Inc.*,
417 F.3d 1342 (Fed. Cir. 2005)...................................................................... 6

*Dow Chem. Co. v. Nova Chems. Corp.*,
803 F.3d 620 (Fed. Cir. 2015)........................................................................ 7

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
815 F.3d 1314 (Fed. Cir. 2016)...................................................................... 3

*ePlus, Inc. v. Lawson Software, Inc.*,
700 F.3d 509 (Fed. Cir. 2012)........................................................................ 6

*Fundamental Innovation Sys. Int'l LLC v. Samsung Elecs. Co.*,
No. 2:17-cv-145-JRG-RSP, 2018 WL 647734 (E.D. Tex. Jan. 31, 2018)
(J. Payne, Mag.), *adopted* ECF 157 (E.D. Tex. Feb. 20, 2018)..................... 8

*GE Lighting Sols., LLC v. Lights of Am., Inc.*,
663 F. App'x 938 (Fed. Cir. 2016) ............................................................... 13

*Imperium (IP) Holdings, Inc. v. Apple, Inc.*,
920 F. Supp. 2d 747 (E.D. Tex. 2013)............................................................ 7

*In re Cohn*,
438 F.2d 989 (C.C.P.A. 1971) ....................................................................... 7

*Innovative Display Techs. LLC v. Acer Inc.*,
No. 2:13-cv-00522-JRG, 2014 WL 3402529 (E.D. Tex. July 11, 2014).......... 1

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
383 F.3d 1295 (Fed. Cir. 2004)..................................................................... 19

*JuxtaComm-Texas Software, LLC v. Axway, Inc.*,
No. 6:10-cv-011, 2012 WL 7637197 (E.D. Tex. July 5, 2012), *aff'd JuxtaComm-Texas
Software, LLC v. TIBCO Software, Inc.*, 532 F. App'x 911 (Fed. Cir. 2013) ........... 7

*Lodsys, LLC v. Brother Int'l Corp.*,
No. 2:11-cv-90-JRG, 2013 WL 6442185 (E.D. Tex. Mar. 12, 2013).........................................1

*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996)..........................................................................................................1, 3, 4

*MasterMine Software, Inc. v. Microsoft Corp.*,
874 F.3d 1307 (Fed. Cir. 2017)...............................................................................................20

*Meds. Co. v. Mylan, Inc.*,
853 F.3d 1296 (Fed. Cir. 2017).........................................................................................20, 21

*Michael S. Sutton Ltd. v. Nokia Corp.*,
647 F. Supp. 2d 737 (E.D. Tex. 2009)....................................................................................13

*MOBA, B.V. v. Diamond Automation, Inc.*,
325 F.3d 1306 (Fed. Cir. 2013)..................................................................................................3

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
134 S. Ct. 2120 (2014)...........................................................................................................6, 7

*Novo Indus., LP v. Micro Molds Corp.*,
350 F.3d 1348 (Fed. Cir. 2003)..................................................................................................6

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)..................................................................................................3

*Phoenix Licensing, L.L.C. v. AAA Life Ins. Co.*,
No. 2:13-cv-1081-JRG-RSP, 2015 WL 11110605 (E.D. Tex. Apr. 7, 2015)............................1

*Power-One, Inc. v. Artesyn Techs., Inc.*,
599 F.3d 1343 (Fed. Cir. 2010)..................................................................................................5

*Skyhook Wireless, Inc. v. Google, Inc.*,
No. 10-cv-11571-RWZ, 2012 WL 4076180 (D. Mass. Sept. 14, 2012)....................................7

*Sucampo, AG v. Dr. Reddy's Labs., Inc.*,
No. 3:14-cv-7114 (MAS) (D.N.J. Mar. 4, 2016) ......................................................................2

*Sulzer Textil A.G. v. Picanol NV*,
358 F.3d 1356 (Fed. Cir. 2004)..................................................................................................5

*SUMMIT 6, LLC v. Samsung Elecs. Co.*,
802 F.3d 1283 (Fed. Cir. 2015)..................................................................................................3

*TQP Dev., LLC v. Wells Fargo & Co.*,
   No. 2:12-cv-61, 2013 WL 6247363 (E.D. Tex. Dec. 02, 2013) ................................................ 1

*Uniloc USA, Inc. v. Samsung Elec. Am., Inc.*,
   No. 2:17-cv-00651-JRG (ECF 70) (E.D. Tex. Oct. 11, 2018)................................................... 1

## I.    <u>ESD VIOLATES THE COURT'S RULES AND INVITES LEGAL ERROR</u>

ESD cites extrinsic evidence not disclosed in its PLR 4-2 or 4-3 disclosures and submits claim constructions not disclosed in its PLR 4-2 or 4-3 disclosures. ESD seeks to usurp the Court's role and "explain" disputed claim terms/phrases to jurors. And ESD urges the Court not to make its claim constructions clear to jurors. Mentor, in contrast, obeyed the rules and asks the Court to ensure the jurors understand the claims.

### A.    <u>The Court Should Strike ESD's Extrinsic Evidence</u>

The Court's Rules prohibit *Markman* by ambush.[1] Flouting those rules, ESD cites five dictionaries and other items of extrinsic evidence not disclosed in its PLR 4-2 or 4-3 disclosures.[2] PLR 4-3(b) required ESD to identify "any extrinsic evidence known to [it] on which it intends to rely either to support its proposed construction of the claim or to oppose [Mentor's] proposed construction." But ESD disclosed no extrinsic evidence, relying entirely on Mentor's extrinsic evidence. (ECF 74-2 at 13, 15, 20, 24, 32, 44, 52, 54–55, 62–63.) The Court has stricken extrinsic evidence for violation of PLR 4-2 or 4-3[3] and should strike all five items of extrinsic evidence ESD cites in its brief but omitted from its PLR 4-2 and 4-3 disclosures.

---

[1] "Both the letter and the spirit of the Patent Rules require early and complete disclosure of extrinsic evidence relevant to claim construction." *Lodsys, LLC v. Brother Int'l Corp.*, No. 2:11-cv-90-JRG, 2013 WL 6442185, at *2 (E.D. Tex. Mar. 12, 2013).

[2] ESD Br. at 6, n.7; 8, n.14; 11, n.28; 15, n.44; 17, n.50.

[3] *See Uniloc USA, Inc. v. Samsung Elec. Am., Inc.*, No. 2:17-cv-00651-JRG (ECF 70) (E.D. Tex. Oct. 11, 2018); *Phoenix Licensing, L.L.C. v. AAA Life Ins. Co.*, No. 2:13-cv-1081-JRG-RSP, 2015 WL 11110605, at *1 (E.D. Tex. Apr. 7, 2015); *Innovative Display Techs. LLC v. Acer Inc.*, No. 2:13-cv-00522-JRG, 2014 WL 3402529, at *1-2 (E.D. Tex. July 11, 2014); *TQP Dev., LLC v. Wells Fargo & Co.*, No. 2:12-cv-61, 2013 WL 6247363, at *4 (E.D. Tex. Dec. 02, 2013).

### B.     The Court Should Strike ESD's "Alternative Constructions"

The Court should strike all of ESD's proposed constructions but one (for "cylindrical accumulation mode basis functions")[4] because ESD failed to disclose these constructions in violation of PLR 4-2 and 4-3. ESD for months hid its counter constructions to Mentor's duly disclosed constructions, behind the opaque placeholder "plain meaning"—by which it did *not* mean a "common parlance" meaning understood by lay jurors—without proposing an actual construction (except for one term). (*See* ECF 74-2, 72, 74-3.) This rule violation prejudiced Mentor. "'Advocating for ordinary meaning does not excuse a party from stating what it contends is that meaning.'" *Sucampo, AG v. Dr. Reddy's Labs., Inc.,* No. 3:14-cv-7114 (MAS), at 2 (D.N.J. Mar. 4, 2016) (citation omitted). The Court should not tolerate ESD's tactic:

> An assertion by a party that the disputed claim terms should be construed in accordance with their ordinary or plain meaning does not excuse the party from complying with discovery or other case management orders requiring a proffering of a proposed construction. After all, the plain meaning to apply is the plain meaning to one of ordinary skill in the art, not to a layman or lay counsel. Disputes frequently arise as to what one of skill in the art would use as the ordinary or plain meaning. Thus, when a discovery order, a case management order, or a local rule requires a party to provide its contentions relating to claim constructions it is generally improper for a party to state generally that the ordinary meanings of the claim terms should govern and then refuse to set forth what it contends are those ordinary meanings.

Ex. A (collecting cases).

### C.     It Is The Court's Exclusive Duty To Construe The Claims For The Jury

The Court's duty is to instruct the jury on the legally correct construction of all nine terms/phrases identified for construction, because ESD disputes at least part of Mentor's proposed construction for each term/phrase, and none (e.g., "basis functions") is in common parlance or certain to be correctly understood by a juror without a graduate degree in

---

[4] ESD's previously-undisclosed constructions are on pages 5, 10, 12, 16, 18, 23, and 24 of its Brief. (ECF No. 74, hereinafter "ESD Br.")

mathematics. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996) ("We hold that the construction of a patent, including terms of art within its claim, is exclusively within the province of the court."). "When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). The Court's construction must be complete, leaving nothing for the jury to interpret. *MOBA, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1313 (Fed. Cir. 2013) ("In essence, the district court allowed the jury to add an additional limitation to the district court's construction of 'guiding steps.' In this, the district court erred. Claim construction is a question of law and is not the province of the jury."). Therefore, it is legal error to instruct a jury to give a claim term its "plain and ordinary meaning" when the parties dispute the correct legal interpretation of that term, because it would invite the jury to intepret the claims in violation of *Markman*:

> By determining only that the terms should be given their plain and ordinary meaning, the court left this question of claim scope unanswered, leaving it for the jury to decide. This was legal error. The dissent contends that the court did, in fact, resolve the parties' dispute by rejecting Silver Spring's "special definition" in favor of plain and ordinary meaning. Dissent at 1329-30. But simply rejecting one proposed construction does not mean that a general jury instruction to give terms their plain and ordinary meaning resolves the relevant dispute. The court remained obligated to provide the jury with a clear understanding of the disputed claim scope — and the continuing debate as to the meaning of "portable" and "mobile" during the trial belies the court's boilerplate assertion that it did so.

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1319–1320 (Fed. Cir. 2016) (citation omitted). A court may instruct a jury to give a claim term its "plain and ordinary" meaning *only* when that invites no jury interpretation. This occurs only when the undisputed and correct legal interpretation of the term is the "common parlance," non-technical meaning all jurors already understood before the trial. *See SUMMIT 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015).

ESD urges the Court to shirk this exclusive duty and "allow the parties to provide whatever elaboration they desire through expert testimony." (ESD Br. at 17; *see also id*. at 5.) That would violate two decades of governing precedents "allocat[ing] all issues of construction to the court" including "construction of terms of art." *Markman*, 517 U.S. at 390. To defend its attempt to return to pre-*Markman* days, ESD conflates two starkly different types of "plain meaning": (1) the technical plain meaning known to specialists in the art but not to a lay juror, and (2) the non-technical, ordinary English plain meaning of words in common parlance. (*See* ESD Br. at 4–5.) If, as here, a patent claim uses a term according to the first, technical type of plain meaning, and the parties dispute that meaning, then the Court must instruct the jury on the correct construction of that claim term, per the above precedents.

The terms "basis functions," "charge density distribution," "linearly combines," "equivalent circuit equations," "conductance," etc., are not in common parlance.[5] Therefore, given the parties' dispute over their correct interpretation, it is the Court's duty to provide a complete construction of each disputed term and phrase.

### D.   The Court Must Ensure Each Juror Understands The Correct Meaning

If it cannot dissuade the Court from explaining the claims to the jury, then ESD's fallback is to have them explained in a way that the jury does not understand (so ESD can then "explain" them to the jury). For example, ESD criticizes Dr. Nagel for explaining the claims in a manner a jury might understand: "[Nagel] was trying to make the term more 'clear' for someone who is not skilled in the art, which is not the purpose of claim construction." (ESD Br. at 10.) ESD is wrong. It is the Court's duty to *ensure* that the jury understands the Court's claim construction so

---

[5] The only term most jurors may have heard is "cross section," but this too must be construed because it has a particular meaning in mathematics that ESD seeks to avoid. *See infra* at III.E.

that jurors do not make up their own interpretations. The Court "must '*ensure* that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims.'" *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (emphasis added) (citation omitted). The Court further "must at minimum *take steps to assure* that the jury understands that it is not free to consider its own meanings for disputed claim terms and that the district court's claim construction, determined as a matter of law, is adopted and applied by the jury in its deliberation of the facts." *Sulzer Textil A.G. v. Picanol NV*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) (emphasis added). Thus, a "plain meaning" instruction here would be legal error because it cannot *ensure* that the jury understands the correct mathematical meaning of these terms. Of course, it may require more than one sentence to *ensure* jury understanding of any point of law, be it a patent claim element[6] or an element of securities fraud.[7]

## II.   THE FOURTH ELEMENT IS INTERNALLY INCONSISTENT, INCONSISTENT WITH THE SPECIFICATION, NONSENSICAL, AND THUS INDEFINITE

Claim Element: The fourth claim element of each independent claim recites in part: "linearly combines selected cylindrical accumulation mode basis functions to approximate a charge density distribution *over the cross section* of the cylindrical conductor." (ECF 74-4 at 18:5–8 (emphases added).)

Summary: This claim element is internally inconsistent and inconsistent with the specification, making it nonsensical to a skilled artisan. (*See* ECF 74-2 at 48–49.) It is nonsensical in part because it recites (in the red-underscored language) combining functions that the patent defines as describing charge densities *on the surface of a conductor* (e.g., ECF 74-4 at

---

[6] *See, e.g., Akamai Techs. Inc. v. Limelight Networks, Inc.*, 805 F.3d 1368, 1377 (Fed. Cir. 2015).

[7] *See* Fifth Circuit's *PATTERN JURY INSTRUCTIONS (Civil Cases)*, § 7.1 (2014).

7:21–23, 7:55–58), to approximate charge densities *inside the conductor* (i.e., "over the cross

section of the cylindrical conductor," as recited in the blue-underscored language). This element

would only make sense if it were re-written to replace the recited "cross section" with "surface"

so that it describes combining functions that describe density distribution on *the surface* of the

conductor to approximate a density distribution on *the surface* of the conductor. Tellingly, that is

how one of the named inventors, Dr. Han, described this mathematical operation in his thesis in

2009: "The *surface* charge density distribution on a cylinder is approximated by the linear

combination of global harmonic basis functions." (*See* Ex. B ("Han Dissertation") at MENT-

ESD_0006321 (emphasis added).) But the Court may not rewrite the claims to correct this defect

because ESD insists there is no error. (ESD Br. at 20–23; *see also* Ex. C at 3–4.)  *See Novo*

*Indus., LP v. Micro Molds Corp.*, 350 F.3d 1348, 1354 (Fed. Cir. 2003).

  <u>Inconsistent Claim Elements Are Indefinite</u>: This fourth claim element renders each

claim "indefinite" under 35 U.S.C. § 112, ¶ 2 (pre-AIA). "[I]ndefiniteness is a question of law

and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517

(Fed. Cir. 2012); *accord Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed.

Cir. 2005) ("A determination of claim indefiniteness is a legal conclusion that is drawn from the

court's performance of its duty as the construer of patent claims."). Patent claims must

"particularly point[] out and distinctly claim[] the subject matter which the … inventor regards as

the invention." 35 U.S.C. § 112, ¶ 2. In 2014, the Supreme Court reinvigorated this "clarity and

precision demand" by rejecting the Federal Circuit's "amenable to construction" and "insolubly

ambiguous" test as not even "probative of the essential inquiry." *Nautilus, Inc. v. Biosig*

*Instruments, Inc.*, 134 S. Ct. 2120, 2122, 2130 (2014). Soon thereafter, in a different case, the

Federal Circuit revisited a patent claim it had held not indefinite pre-*Nautilus*, and held it

indefinite under *Nautilus*. *See Dow Chem. Co. v. Nova Chems. Corp.*, 803 F.3d 620, 623–24, 634–35 (Fed. Cir. 2015).

A patent claim is invalid if, when read in light of the intrinsic evidence, it "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 134 S. Ct. at 2124. Although this standard "mandates clarity," it also "recogniz[es] that absolute precision is unattainable" and that "some modicum of uncertainty … is the 'price of ensuring appropriate incentives for innovation.'" *Id*. at 2128, 2129 (citation omitted). Still, "a patent must be precise enough to afford clear notice of what is claimed, thereby "'appris[ing] the public of what is still open to them,'" in a manner that avoids "[a] zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims." *Id*. at 2129. Internally inconsistent claim elements failed the "the statute's clarity and precision demand," *id.* at 2124, even before *Nautilus* strengthened the test.[8] And such inconsistencies of course still render patent claims indefinite post *Nautilus*. *Fundamental Innovation Sys. Int'l LLC v. Samsung*

---

[8] *See In re Cohn*, 438 F.2d 989, 993 (C.C.P.A. 1971) (holding two different parts of the claim to be internally inconsistent and therefore indefinite); *Competitive Techs., Inc. v. Fujitsu Ltd.,* 185 F. App'x 958, 965–66 (Fed. Cir. 2006) (non-precedential) ("Because the 'address means' limitation of claim 5 requires ISA structures, and the 'sustain means' limitation of that same claim excludes ISA structures, a person of ordinary skill in the art would be unable to determine the scope of the claims. They are internally inconsistent. We therefore conclude that the court did not err in holding that claims 5-11 are invalid because of indefiniteness."); *JuxtaComm-Texas Software, LLC v. Axway, Inc.,* No. 6:10-cv-011, 2012 WL 7637197, at *5 (E.D. Tex. July 5, 2012) (holding claims invalid under 35 U.S.C. § 112, ¶ 2, where "the claims require data transformation to occur within the systems interface, while the specification plainly contradicts such a teaching by disclosing that the systems interface is merely used for defining the scripts that control data flow"), *aff'd JuxtaComm-Texas Software, LLC v. TIBCO Software, Inc.*, 532 F. App'x 911 (Fed. Cir. 2013); *Skyhook Wireless, Inc. v. Google, Inc*., No. 10-cv-11571-RWZ, 2012 WL 4076180, at *11 (D. Mass. Sept. 14, 2012) (claim held indefinite where claim limitation is nonsensical in view of inconsistency with specification); *cf. Imperium (IP) Holdings, Inc. v. Apple, Inc.*, 920 F. Supp. 2d 747, 764–65 (E.D. Tex. 2013) (accepting that a claim's inconsistency with the specification can render the claim invalid for indefiniteness, but finding no such inconsistency).

*Elecs. Co.*, No. 2:17-cv-145-JRG-RSP, 2018 WL 647734, at *40 (E.D. Tex. Jan. 31, 2018) (J.

Payne, Mag.) (holding that claim is "internally inconsistent and, as a result, is indefinite"),

*adopted* ECF 157 (E.D. Tex. Feb. 20, 2018).

    <u>Intrinsic Evidence Shows the Inconsistencies</u>: "Study a carrot's surface to see the inside

of a banana" is internally inconsistent and nonsensical. The '232 patent's fourth claim element is

analogous. It is internally inconsistent primarily because it recites combining *surface* functions

(accumulation mode basis functions) that have no meaning inside a conductor, to approximate

values *inside* the conductor. All agree "accumulation mode basis function" is a term coined

within the patent (ESD Br. at 12; Ex. D (Nagel Depo. Tr. excerpts, hereinafter, "TR") 183:13–

184:7), so its meaning must be found in the intrinsic evidence, read from the perspective of the

skilled artisan. The specification expressly describes it as a mathematical function describing

charge density distribution on the *surface* of a conductor: "The cylindrical accumulation mode

basis function captures the charge density distribution on the surface of cylindrical conductors

…." (ECF 74-4 at 7:21–23.) Not once does the specification say that accumulation mode basis

functions describe *anything* inside the conductor. On the contrary, the specification distinguishes

these *surface* "accumulation mode" basis functions from the different, *internal* "conduction

mode" basis functions that describe a distribution of current density *inside* a conductor: "the

accumulation mode bases are different from the conduction mode bases in that they are scalar

functions defined on the conductor surfaces." (ECF 74-4 at 7:55–58.) The patent applicants

repeated this same surface-versus-inside distinction during prosecution: "Accumulation mode

basis functions are functions that describe charge density distribution on the surface of a

conductor…. On the other hand, conduction mode basis functions describe current (rather than

charge) density in a conductor, which is more distributed in the interior portions of a conductor."

(Ex. E at 10.) Thus, the specification and prosecution unequivocally define this coined term in part as describing charge density distribution *on the surface* of a conductor, not inside it.

Linearly combining these *surface* functions approximates charge density distribution on—unsurprisingly—the *surface* of a conductor. (*See* ECF 74-4 at 7:21–58, 8:43–50; TR 139:2–140:5.) But the claims do not say that. Instead, the second half of this fourth claim element ("approximate a charge density distribution over the cross section of the cylindrical conductor") recites something different that makes no sense because *surface* functions cannot be linearly combined to approximate charge density distribution "over the cross section" of the conductor any more than describing the skin of a carrot approximates the inside of a banana. The conductor's "cross section" is not its surface. It is the two-dimensional disc inside the conductor perpendicular to the conductor's long axis, as depicted in Fig. 2 of the patent (and on pg. 2 of ESD's Brief). (*See infra* at III.B.) Further, the two halves of this claim element are based on two conflicting assumptions about the conductor—the first half's surface functions assume a conductor with charges only on its surface; the second half assumes a conductor with charges inside the conductor. Study a carrot's surface to see the inside of a banana.

Unrebutted Expert Testimony Demonstrates the Inconsistencies: Dr. Nagel explained how this claim element is nonsensical to a skilled artisan. *First*, the patent specification assumes the conductor is an "ideal" conductor (in which charge appears only on the conductor's surface), both by saying so expressly (TR 99:13–19, 104:25–105:11) and by consistently stating that the charge is only on the surface of the conductor—which is true only of a good (ideal) conductor (TR 96:24–97:9, 101:25–102:20, 104:25–105:11). *Second*, the patent defines its "accumulation mode basis functions" as describing charge density on the surface of the conductor—not inside it. (TR 74:4–18, 75:24–76:4, 202:14–23.) As Dr. Nagel explained, the patent's accumulation

9

mode basis functions "won't have any meaning in the inside of the conductor" (TR 139:3–19), and do not have the capability to get a distribution over a cross section because "they're only good at the surface." (TR 139:20–140:5.) One reason for this is that the units needed to describe charge density distribution on the surface of a conductor are different than those needed to describe charge density distribution over a cross section. The latter—density inside a poor 3D conductor—is measured in charge per unit *volume* (e.g., per *cubic* inch), but the former—charge density at the 2D surface—is measured in charge per unit *area* (per *square* inch). (TR 73:18–74:3, 83:6–16, 91:6–12, 139:11–140:5, 141:14–143:22, 189:19–190:9.) *Third*, the claims introduce a "fundamental contradiction" (TR 98:11–99:3) by asserting that these per-area, surface-charge accumulation mode basis functions are combined to approximate the per-volume charge density distribution inside a conductor ("over the cross section") where these functions have no meaning and do not work, and where the specification assumes there is *no* charge density (TR 99:13–19, 104:25–105:11, 139:11–140:5).

In sum, the claims are "unclear" (TR 100:21–101:8), "make no sense" (*id*.), "conflict[] with all the rest of the specification" (TR 98:3–99:3), and create a "fundamental contradiction … between the specification and the claim" (*id*.). All of this testimony is unrefuted by evidence.

ESD badly misstates Dr. Nagel's testimony. Contrary to ESD's Brief, Dr. Nagel did *not* "agree[] that charge density distribution over a good conductor's cross section could be represented by something like a radar weather map." (ESD Br. at 21, 21 n.61.) ESD cites the ten lines of testimony reproduced below, where Dr. Nagel merely uttered "uh-huh" and "Okay" to indicate that he was listening, with no question posed to him:

> 7 Q. Let's say you have a cross section of a
> 8 cylindrical conductor and that will be a disk, to
> 9 use your terminology.
> 10 A. *Uh-huh.*

> 11 Q. And if we are showing charge density, the
> 12 charge density distribution across that cross
> 13 section, and let's say we're representing it by
> 14 color. You know, it's somehow -- like a weather
> 15 radar map, you know, it varies with intensity.
> 16 A. *Okay*.

(TR 110:7–16 (emphases added).)

Dr. Nagel expressly rejected what ESD represents he accepted; and testified that a good

(ideal) conductor does *not* have a charge density distribution over a cross section because "a

charge density distribution over the cross section … suggests that there's a charge inside the

conductor. Which could only be true if it was a non-ideal conductor, a piece of plastic or

something like that." (TR 109:7–12.) Dr. Nagel made this point repeatedly (TR 98:3–99:3,

101:15–102:20, 104:25–105:11, 108:19–109:12, 189:19–190:9), never once agreeing to what

ESD's brief represents he agreed to.[9]

Also contrary to ESD's Brief, Dr. Nagel did *not* testify that his "opinion was largely

based on his *personal confusion* as to why the inventors would use *somewhat different language*

in the claims than in describing *particular embodiments*." (ESD Br. at 22 (emphases added).) Dr.

Nagel instead explained that this fourth element's reference to "cross section" creates a

"fundamental contradiction … between the specification and the claim" (TR 98:11–99:3) and

contradicts the *entire* specification (not merely particular examples) limiting accumulation mode

basis functions to the conductor's surface (TR 91:6–12, 98:3–99:3, 139:3–140:5). That an expert

cannot understand why one would choose to draft a nonsensical patent claim (TR 104:2–18) does

not cure the claim, and neither does misstating that expert's testimony.

---

[9] Similarly, ESD's statement that "Dr. Nagel admitted that charge density distribution can be approximated over the cross section of a conductor" (ESD Br. at 22, with no citation) is incorrect if applied to the patent's (ideal) conductors or to the patent's accumulation mode basis functions—both of which Dr. Nagel denied (TR 98:3–99:3, 101:9–102:20, 104:25–105:11, 108:19–109:12, 139:3–140:5, 190:2–5).

<u>ESD's Attempts to Make Sense of this Claim Element All Fail</u>: *First*, ESD suggests that this claim element's reference to charge density distribution "over the cross section" indicates that the conductor may be a poor conductor in which there is charge density inside the conductor. (*See* ESD Br. at 21 ("are not limited to good conductors").) ESD is partly right, but understates the point—the claim element's second half implies that the conductor *is* a poor conductor, not merely may be a poor conductor. But, either way, that is part of the problem. So understood, this claim element is (1) internally inconsistent—because it refers to combining *surface* accumulation basis functions which have no meaning and do not work inside the conductor (TR 139:3– 140:5)—and (2) inconsistent with the specification—which assumes the conductor is a good conductor with all charge density at the surface (ECF 74-4 at 5:32–34, 7:27–29). *Second*, ESD apparently also suggests that, because a good conductor has charge density over its surface, and the *perimeter* of the cross section is at the surface, there is charge density "over the cross section." (*See* ESD Br. at 21.) More simply, the conductor's outside is its inside because the outside touches the inside. Unsurprisingly, no PLR 4-3 evidence supports this attorney-argument logical fallacy. On the contrary, as Dr. Nagel explained, the circular perimeter of a cross section is not a cross section. The cross section is the entire 2D disc inside the cylinder. (TR 106:5–14, 106:22–107:4, 143:10–147:9.) Also, as noted, the charge density distribution over the cross section is in per-volume units; a charge density distribution around a circle (which is not mentioned in the patent) would be in per-distance units. *Third*, ESD argues that "approximating charge density distribution on the surface accomplishes approximating charge density distribution over the cross section for the very reason that no charge exists or is present inside the conductor." (ESD Br. at 22–23.) But, again, no evidence supports this attorney argument, and Dr. Nagel explained why it is wrong. (TR 142:15–144:14.) For one, charge density on the

12

surface is measured per unit of area (e.g., square inches) but charge density over a cross section is measured per unit volume (e.g., cubic inches). (TR 143:11–21.)

ESD's attempts to defend this claim element—proffering no evidence of its own and misstating Dr. Nagel's testimony—just reinforces how nonsensical it is. *Cf. Michael S. Sutton Ltd. v. Nokia Corp.*, 647 F. Supp. 2d 737, 745 (E.D. Tex. 2009) ("[The] attempts to resolve the logical inconsistencies within claim 3 only creates more logical inconsistency or entirely rewrites the claim language. ... Though the inconsistency within claim 3 is likely the result of mere drafting error, courts are not permitted to rewrite claim language."). If there is no charge density inside the conductor—as the patent assumes—then it makes no sense to approximate the distribution of that non-existent charge density. (*See* TR 115:12–25.) Even if it did make sense to approximate that internal charge density (per volume), it makes no sense to do so using functions that approximate surface charge density (per area). ESD could have presented expert testimony to try to rebut Mentor's position—disclosed in June—that this claim element is indefinite, but it did not. The Court should rule all asserted claims indefinite under 35 U.S.C. § 112, ¶ 2.

Construction of Fourth Claim Element: Mentor also proposes a construction of this claim element. (ECF 74-2 at 44.) It is amenable to construction because each half of the element makes sense; it is their combination which is nonsensical. The construction tracks that of the third claim element (*see infra* at III.E), replacing "current" with "charge." (*See* TR 121:16–129:5, 148:1– 155:18, 179:12–182:13, 201:19–202:23; ECF 74-2 at 44–52.) So construed, this claim element remains indefinite. *Cf. GE Lighting Sols., LLC v. Lights of Am., Inc.*, 663 F. App'x 938, 940–41 (Fed. Cir. 2016) (non-precedential) (construing "elongated" and then ruling it indefinite).

## III.   **CLAIM CONSTRUCTIONS**

Eight disputed claim terms are in an unusually straightforward procedural posture: the parties agree that these terms are used in the patent per their plain technical (mostly

mathematical) meaning and only a single expert (Dr. Nagel) has explained that meaning.[10] ESD

does not challenge Dr. Nagel's expertise, nor could it as he is a leading expert in this field.[11] Dr.

Nagel studied the '232 patent to determine how a skilled artisan (*see* TR 40:16–42:19) would

understand the disputed claim terms, and, in June, Mentor summarized his expected opinions in

51 bullet points. (*See* ECF 74-3.) Months later, ESD deposed Dr. Nagel for about six hours on

the record, inviting him to further explain his opinions and the bases therefor, and so he did.[12]

His accompanying declaration incorporates that testimony. (Nagel Decl. ¶ 3.) Mentor asks the

Court to find that Dr. Nagel has accurately described the technical meaning of each term/phrase.

A.      **"basis function(s)"**

| Mentor Graphics | ESD |
|---|---|
| A set of mathematical functions designed to be linearly combined to describe <u>another</u> <u>function or</u> functions which constitute the solution to a mathematical problem. | *Plain Meaning* |

Disputes: Are basis functions (1) combined to "*describe*" another function (2) to solve a

"*mathematical*" problem? Dr. Nagel answers both questions, Yes. (TR 47:4–49:7, 49:22–50:15,

54:3–55:10; ECF 74-3 at 10.)

---

[10] This is true of "basis functions" (TR 129:13–20; ESD Br. at 5), "constructed on cylindrical coordinates" (TR 129:21–130:11; ESD Br. at 7–8), "current density distribution" (TR 130:12–131:8; ESD Br. at 10), "charge density distribution" (TR 141:14–22; ESD Br. at 10), "linearly combine" (TR 128:21–129:5; ESD Br. at 16), "cross section" (ECF 74-2 at 38; ESD Br. at 16), "equivalent circuit" (ECF 74-2 at 57–58; ESD Br. at 23), and "construct an equivalent resistance, inductance, conductance, capacitance (RLCG) circuit" (TR 160:1–162:1; ESD Br. at 24-25).

[11] Dr. Nagel earned a Ph. D. in electrical engineering from U. C. Berkeley; invented the industry standard SPICE circuit simulation program; worked at Bell Laboratories for two decades; understands the historical roots of the patent's math; and has reviewed approximately 1,000 patents. (TR 9:3–12:10, 19:21–24, 21:19–22:5, 31:5–9, 46:6–47:2; *see also* Nagel Decl. (attaching resume).)

[12] Mentor withdraws the point where Dr. Nagel disagreed with its summary. (*See* ESD Br. at 19.)

This term must be construed because the parties agree it has its plain mathematical meaning (*see* ESD Br. at 5–6; TR 45:15–47:11), but dispute that meaning. Dr. Nagel testified that the well-known meaning of "basis functions" is Mentor's proposed construction (with one above-noted modification). (TR 28:24–30:2, 45:11–50:15, 129:6–20, 150:2–151:6; ECF 74-3 at 10–12.) The intrinsic evidence agrees. For example, the patent explains that "basis functions" are linearly combined to "describe" a density distribution. (ECF 74-4 at 7:14–17.)

ESD's objections are not sound. *First*, ESD objects to "describe" (ESD Br. at 6–7), but that was the applicants' chosen word, as noted above. (*See also* TR 47:4–11.) *Second*, although Dr. Nagel agreed that a technical dictionary definition was "perfectly fine" (ESD Br. at 6), neither party proposes that mathematically complex definition as the construction. *Third*, ESD's suggestion that Dr. Nagel described the patent's functions as solving a physics problem misstates his testimony—Dr. Nagel explained that the patent's basis functions solve a *mathematics* problem. (*Compare* ESD Br. at 7, *with* TR 47:4–49:7, 49:22–50:15, 54:3–55:10.) The patent agrees, stating that basis functions solve "equations." (ECF 74-4 at 3:7–9, 5:58–60.)

### B.  "constructed on cylindrical coordinates"

| Mentor Graphics | ESD |
|---|---|
| Calculated in 3D with: (1) position along the cylinder's long axis, (2) radial distance from the long axis, and (3) azimuth. Azimuth is the angular position around the long axis relative to a reference direction, similar to how longitude on the Earth is a position around the Earth's axis. | *Plain Meaning* |

Disputes: (1) Are basis functions mathematical functions that are *calculated*?; (2) are cylindrical coordinates in *three* dimensions?; (3) does "azimuth" need to be explained to *ensure* jurors understand it correctly? Dr. Nagel answers the first two questions, Yes. (TR 55:18–25, 56:3–13, 58:16–66:5; ECF 74-3 at 12–13.)

This phrase must be construed because the parties agree it has its plain technical meaning (*see* ESD Br. at 7–8; TR 55:11–17), but dispute that meaning. Dr. Nagel testified that Mentor's

15

construction is that plain meaning. (TR 55:11–56:2, 71:9–16, 129:21–130:11; ECF 74-3 at 12–13.) His testimony is supported by intrinsic and extrinsic evidence.[13]

ESD's objections are not sound. *First*, it cites a previously undisclosed dictionary definition, choosing the one definition in that dictionary furthest from this mathematical patent: constructing bridges. (ESD Br. at 8, n.14; Ex. F at 1.) In these claims, the grammatical object of this verb "construct" is a mathematical function, not a bridge. *Cf. Artis v. District of Columbia*, 138 S. Ct. 594, 603–04 (2018) ("District offers no reason why, in interpreting 'tolled' as used in § 1367(d), we should home in only on the word itself, ignoring the information about the verb's ordinary meaning gained from its grammatical object. Just as when the object of 'tolled' is 'bell' or 'highway traveler,' the object 'period of limitations' sheds light on what it means to 'be tolled.'"). In context, "constructed on" means "calculated in." (TR 55:18–25, 56:3–13, 58:16–22.) Even ESD describes the patent's math as "calculating" values. (ESD Br. at 2–3.)

*Second*, ESD argues that jurors would understand "cylindrical coordinates" (ESD Br. at 9), but then incorrectly describes the nature of a cylinder's cross section. In mathematics, a circle is distinct from a disc, but ESD conflates the two. A "circle" is a one-dimensional line whose points are all equally distant from a center point and a "disc" is that line *and* the 2D surface interior of that line. (TR 106:5–107:4.)



**Circle**          **Disc**

---

[13] Ex. G at ESD 87500–01; Ex. B (Han Dissertation) at MENT-ESD_00006322; Ex. H at MENT-ESD_00001314, 1326; *see* ECF 74-3 at 13–14.

The cross section of a solid cylinder is a disc (measured, e.g., in square inches) such as those depicted in the patent's Fig. 2, not a circle. (*See* TR 106:5–14, 145:2–22.) Yet, despite Dr. Nagel having explained the correct terminology, ESD says that the cross section is a circle: "cross-sections of cylinders (i.e., circles)." (ESD Br. at 9.) No doubt many jurors—not being mathematicians—would miss the flaw in ESD's assertion. Perhaps ESD meant disc, but its error likely is no accident—its infringement case depends on conflating what mathematics distinguishes: a 2D surface with a 1D line, the outside surface of a cylinder with its inside cross section, an area with a volume, multiplying functions with adding functions, etc. This is one reason why it is the *exclusive* duty of the Court to instruct the jury on the correct, clear, and complete legal interpretation of *each* disputed term and phrase—even a seemingly simpler term like "cylindrical coordinates."

*Third*, ESD protests that the four letters "in 3D" would "encumber" the construction. (ESD Br. at 9.) But this diminutive qualifier is essential because the claims say "three-dimensional" and skilled artisans know that 3D cylindrical coordinates (longitudinal position, radial distance, azimuth) are not 2D "polar" coordinates (radial distance, azimuth). (*See also* TR 58:23–66:5; Ex. B (Han Dissertation) at MENT-ESD_00006322.)

### C.   "current density distribution" and "charge density distribution"

| Mentor Graphics (current density distribution) | ESD |
|---|---|
| The electrical current per unit area at each point in a region. | *Plain Meaning* |
| Mentor Graphics (charge density distribution) | ESD |
| The electrical charge per unit area or per unit volume at each point in a region. | *Plain Meaning* |

Disputes: Do these distributions (1) cover *each* point in the region?; (2) describe densities per *unit area* and per *unit volume*, not per unit of distance? Dr. Nagel answers both questions, Yes. (TR 131:9–133:14, 142:1–147:9, 193:18–198:17, 200:8–202:8; ECF 74-3 at 26–27, 29.)

These terms must be construed because the parties agree they have their plain technical meaning (ESD Br. at 10), but dispute that meaning. Dr. Nagel testified that Mentor's proposed constructions are that plain meaning. (TR 130:12–131:8, 139:2–147:9, 188:7–194:21; ECF 74-3 at 26–27, 29.) Most importantly, these are distributions over a region, i.e., the value at each point in a region as shown in the patent's Fig. 2, not an average value over a region.

ESD's objections are not sound. *First*, it says that jurors would understand these terms (ESD Br. at 10–11), but cites no evidence that they are in common parlance. *Second*, ESD complains that Mentor's constructions may require infinite calculations and that Dr. Nagel supposedly had trouble explaining why that is not so. (ESD Br. at 11.) This unsupported attorney argument is wrong—Mentor's constructions do not call for even a single calculation—and Dr. Nagel had no trouble explaining why, despite ESD's examining attorney saying he could not follow Dr. Nagel's point. (TR 131:9–133:14, 193:18–198:17, 200:8–202:8.) *Third*, ESD cites new evidence (ECF 74-5), foreign to the specific context of this patent, to argue that these density distributions may be a 1D distribution along a line, rather than per unit area or per unit volume. (ESD Br. at 11, n.28, n.29.) This too is wrong. (TR 142:1–147:9.) Not a single sentence in the patent refers to charge density distribution over a line. All extrinsic evidence that *is* in the context of this patent (modeling 3D conductors) is to the contrary.[14]

---

[14] Current density distribution: Ex. I at MENT-ESD_00003310 (expressing electric current density as amperes per meter squared); Ex. J at MENT-ESD_00090842; Ex. K at FIG. 2.3, MENT-ESD_00006885; *see also* ECF 74-3 at 27–29. Charge density distribution: Ex. L at MENT-ESD_00088729 ("scalar charge-density function ρ ... with the dimensions *charge/volume*"); Ex. J at MENT-ESD_00090840 ("charge density — The charge per unit area on a surface, or charge per unit volume in space"); *see also* ECF 74-3 at 29–31.

D.      **"cylindrical accumulation mode basis functions"**

| Mentor Graphics | ESD |
|---|---|
| Scalar basis functions describing the charge density distribution on the surface of the cylindrical conductor. Scalar means magnitude without direction. | "Basis functions that enable description of charge density distribution" |

<u>Disputes</u>: Are these (1) *scalar* functions?; (2) "*describing*" charge density distribution?; (3) on the *surface* of the conductor? Dr. Nagel answers all three questions, Yes. (TR 72:18–74:3, 75:24–77:2, 77:25–85:17, 95:16–96:11, 139:2–140:5; ECF 74-3 at 15–16.)

Each party asks the Court to construe this claim term. It is discussed *supra* at II because it is part of the indefinite fourth claim element. All agree it is a "coined" term with no plain technical meaning. (TR 183:13–184:7; ESD Br. at 12.) Where a patent claim term has no ordinary meaning in the art, the "duty thus falls on the patent applicant to provide a precise definition for the disputed term." *Irdeto Access, Inc. v. Echostar Satellite Corp.,* 383 F.3d 1295, 1300 (Fed. Cir. 2004).

The patent applicants expressly defined these functions in the specification in part as "scalar functions defined on the conductor surfaces" (ECF 74-4 at 7:53–58; *see* TR 72:15–100:6, 183:13–184:7; ECF 74-3 at 15–16.). A scalar value is a magnitude only (like temperature) in contrast to a vector quantity which is a magnitude and direction (like wind speed and direction). (ECF 74-3 at 10 (5th bullet point).) Dr. Nagel explained that accumulation basis functions must be scalar quantities for two reasons: "First of all, the patent says they have to be. And secondly, the patent says that they're describing the charge density distribution on the surface of a cylindrical conductor and that's a scalar quantity." (TR 83:6–16; *see also id*. 73:7–12, 73:18–74:3, 79:81:12–83:4, 83:17–84:9.) ESD's objections to "scalar" are not sound. *First*, it argues that only "particular examples" are described as "scalar" (ESD Br. at 15), but applicants defined this coined term without once referring to it as a vector quantity. *See Meds. Co. v. Mylan, Inc.,*

853 F.3d 1296, 1307, 1309 (Fed. Cir. 2017) (limiting claim term having no ordinary meaning in the art to a specific example in the specification, despite the specification labeling that embodiment "non-limiting," because "it is the only *description* of [the claim term] in the patents in suit that casts light on what [the claim term] is"). As explained by Dr. Nagel, *all* "accumulation mode basis functions" in the patent are what Mentor's construction says they are. (TR 83:9–86:25.) *Second*, ESD argues that scalar quantities can be derived from vectors (ESD Br. at 15), citing improper extrinsic evidence (ECF 74-7) omitted from its PLR 4-3 disclosures. But the claims require that these functions be *linearly combined* and there is no evidence that linearly combining vector quantities can calculate a scalar quantity.

The patent applicants further defined accumulation mode basis functions as follows: "Accumulation mode basis functions are functions that *describe* charge density distribution *on the surface* of a conductor." (Ex. E at 10; *see also* ECF 74-4 at 7:21–61 (emphases added).) The specification consistently states that charge density is on the surface and that accumulation mode basis functions describe that charge density on the surface. *See supra* at II. (*See also* TR 76:1–77:2, 95:16–105:3, 139:2–140:5.) ESD's objections to this part of the applicants' definition of this coined term are unsound. *First*, ESD argues that this definition is not a clear disclaimer. (ESD Br. at 14, n.37.) But this sentence is expressly definitional: "accumulation mode basis functions *are* …." (Ex. E at 10 (emphasis added).) Also, disclaimer law does not apply here because this is not a term of art with a broad technical meaning, part of which may have been disavowed in prosecution. Instead, this is a coined term the applicants had a duty to define, as they did in the specification and prosecution. *See MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1311–12 (Fed. Cir. 2017) (affirming claim construction based, in part, on

prosecution history statement even though it did not amount to a disclaimer).[15] *Second*, ESD

cites the specification's introductory reference to the purpose of using these and other functions:

to "enable description of current and charge density distribution." (ESD Br. at 12–13.) But this

common purpose of different functions does not define what either function *is. See Meds. Co.*,

853 F.3d at 1306–07 (rejecting patent owner's proposed construction as reciting merely the

"results obtained" from "efficient mixing"). (*See also* TR 94:1–95:15.) In sum, the Court should

define this coined term in accord with the applicants' express definition in the specification and

the prosecution, as explained by Dr. Nagel.

### E.     linearly combine(s) selected cylindrical conduction mode basis functions to approximate a current density distribution over a cross section of a cylindrical conductor

| Mentor Graphics | ESD |
|---|---|
| Calculate a weighted sum of the selected conduction mode basis functions to approximate the current density distribution over a cross section. A weighted sum multiplies each basis function by a number (not a basis function) and then sums. A cross section is a plane perpendicular to the conductor's long axis. | *Plain Meaning* |

<u>Disputes</u>: (1) Do "weighted sum" and "cross section" need to be explained to *ensure* all

jurors understand them correctly?; (2) is a "cross section" *perpendicular* to the conductor's long

axis? Dr. Nagel answers the second question, Yes. (TR 117:23–118:18, 120:19–121:14; ECF 74-

3 at 19–20.)

This mathematical phrase must be construed to ensure jurors understand it. The patent

uses "linear combination" in the same way that mathematicians have used it since the 19th

Century. (TR 121:16–128:4, 148:1–155:10, 179:23–181:21.) ESD does not dispute the accuracy

of the first sentence of Mentor's construction. (ESD Br. at 16–18.) The remaining sentences

explain two terms used in this undisputed first sentence: "weighted sum" and "cross section,"

---

[15] The *Honeywell Int'l, Inc. v. United States*, 609 F.3d 1292, 1301 (Fed. Cir. 2010), decision passage ESD cites (ESD Br. at 13) does not involve claim construction at all.

whose meanings the parties dispute. The only expert testimony provided (Dr. Nagel's) supports

these explanations. (TR 121:16–129:5, 148:1–155:18, 179:12–182:13, 195:13–201:17; ECF 74-3

at 19–20.) "Weighted sum" is not in common parlance. A linear combination uses a weighted

sum in which each basis function is multiplied by a number (not a basis function) and then

summed (*see* ECF 74-4 at 7:14–17, 8:35–50, Fig. 2), as explained by Dr. Nagel (TR 121:16–

125:5, 150:2–155:10 (multiplying two basis functions would be *non*-linear).). ESD tried to get

Dr. Nagel to conflate adding basis functions with multiplying them together, but he declined.

(*Id*.) A construction of this phrase is necessary to prevent ESD from similarly urging the jury to

conflate non-linear multiplying with linear adding.

 While jurors will have heard of "cross section," the Court must construe it to ensure they

know its correct *mathematical* meaning. ESD urges an incorrect construction based on improper

extrinsic evidence not disclosed in its PLR 4-2 or 4-3 disclosures. (ESD Br. at 17–18.) As Dr.

Nagel explained (TR 117:23–118:18, 120:19–121:14), the '232 patent uses "cross section" per

its mathematically precise meaning of a plane *perpendicular* to the conductor's long axis. (*See*

*also* ECF 74-4 at 3:14–18, 11:29-33, Fig. 2, Fig. 4; *see also* Ex. M at ESD-00000417-18, Fig. 2.)

Dr. Nagel's testimony is backed by intrinsic evidence[16] and other extrinsic evidence.[17]

---

[16] *See* Ex. N at 6; Ex. O at MENT-ESD_00005721 ("the cross-sectional current densities in each of the pieces can be represented by a collection of global basis functions"; Eqn. (10)); *see also* ECF 74-2 at 36–37.

[17] *See* ECF 74-4 at 7:6–11 (citing Ex. P at MENT-ESD_00005712 ("it is common to introduce an approximate representation of the volume currents and surface charges as a weighted sum of a finite set of basis functions."; Eqns. (5) and (6))); Ex. B (Han Dissertation) at MENT-ESD_00006321 ("[t]he surface charge density distribution on a cylinder is approximated by the linear combination of global harmonic basis functions."); Ex. Q at MENT-ESD_00090813 ("linear combination. A linear combination of two or more quantities is a sum of the quantities, each multiplied by a constant (not all the constants being zero)"; *see also* ECF 74-3 at 20–22; ECF 74-2 at 39–40.

F.     **"constructs equivalent circuit equations"**

| Mentor Graphics | ESD |
|---|---|
| Determines a set of linear equations between currents and voltages in a circuit model of two or more conductors. | *Plain Meaning* |

Disputes: Are these equations (1) *determined*?; (2) and *linear*? Dr. Nagel answers both questions, Yes. (TR 155:19–159:17, 187:1–188:6; ECF 74-3 at 31.)

This phrase must be construed because the parties dispute which of its meanings in the art applies (*see* ESD Br. at 23–24) and it is facially ambiguous to a juror: does "equivalent" modify the noun "circuit equations" or does "equivalent circuit" modify the noun "equations"? The intrinsic evidence defines the phrase as Mentor proposes. The provisional application defines "[the] following set of equivalent circuit equations" as in Equation (4), where each of the set are linear equations relating currents and voltages. (Ex. M at 3, ESD-00000418; *see also* ECF 74-4 at 8:20.) Dr. Nagel explains that this is how a skilled artisan would understand this phrase in this patent (TR 155:19–159:17, 187:1–188:6; ECF 74-3 at 31), which also is supported by other extrinsic evidence.[18]

ESD's objections are not sound. *First*, it says "constructs" needs no construction (ESD Br. at 23), but a jury might mistakenly think of "constructs" in a physical context. *Second*, ESD cites dictionary definitions, but not for "equivalent circuit equations." (ESD Br. at 23–24.) The dictionary definitions use more words to define "equivalent circuit" than Mentor's simpler reference to "a circuit model." *Third*, ESD objects to explaining that these are "linear" equations but that is how a skilled artisan understands the term *in this context*. (TR 158:22–159:4.)

---

[18] *See* Ex. J at MENT-ESD_00090843 ("equivalent circuit — 1. An arrangement of common circuit elements that has characteristics over a range of interest electrically equivalent to those of a different or more complicated circuit or device. 2. A simplified circuit which has the same response to changing voltage and frequency as a more complex circuit. Used to facilitate mathematical analysis"), Ex. R at MENT-ESD_00001014, Ex. S at MENT-EST_00011501, Ex. T at MENT-ESD_00089552; *see* ECF 74-3 at 31–33.

G. "**construct an equivalent resistance, inductance, conductance, capacitance (RLGC) circuit**"

| Mentor Graphics | ESD |
|---|---|
| Calculate component values <u>for resistance, inductance, capacitance, and conductance,</u> that model the 3D circuit~~, including resistance, inductance, capacitance, and conductance~~. Conductance is the current that flows between two conductors divided by the voltage between them. | *Plain Meaning* |

<u>Disputes</u>: (1) Are the resistance, etc. values "*calculat[ed]*"?; (2) is the "circuit" the *3D circuit* of the preamble?; (3) does "conductance" need to be explained to *ensure* all jurors understand it correctly? Dr. Nagel answers the first two questions, Yes. (TR 158:23–159:3, 159:18–165:2; ECF 74-3 at 34.)

This phrase must be construed because the parties agree it has its ordinary technical meaning (TR 161:1–162:17; ESD Br. at 24), but dispute that meaning. Also, a juror might misunderstand "construct … circuit" to require making a physical circuit, which is not required. As explained by Dr. Nagel, "construct" here means calculating the four values identified in the claim language (TR 158:23–159:3, 159:18–165:2; ECF 74-3 at 34), as shown also by the intrinsic evidence (ECF 74-4 at 7:63–8:1, 13:14–21, Fig. 9; and cited prior art references[19]) and other extrinsic evidence[20]. ESD's objections mostly are not sound. *First*, ESD objects that "including" might be ambiguous. Mentor slightly modifies its proposal in response. *Second*, ESD objects to defining "conductance" because skilled artisans understand it (ESD Br. at 25), but not all jurors will have a Master's degree in mathematics. Dr. Nagel's definition of "conductance" (ECF 74-3 at 34) is supported by cited prior art (ECF 74-2 at 65). *Third*, ESD objects to singling

---

[19] *See* Ex. V at MENT-ESD_00005793, 5794–96 (including FIGS. 3, 5, and Eqn. (14)); Ex. W at MENT-ESD_00011622, 11624; ECF 74-2 at 63–68.

[20] *See* Ex. X at MENTESD_00006694-95 ("The equivalent circuit in Fig. 9(b) shows the frequency-dependent RLGC elements …."), Ex. U at MENTESD_00090798 (Fig. 1 and associated text); *see also* ECF 74-3 at 34–37.

out "conductance" for explanation (ESD Br. at 25), but a court need not construe a term that neither party has asked to be construed. *Fourth*, ESD objects to explaining that the circuits are "3D" but "equivalent," in part means equivalent to the claim preamble's *3D* circuit. (*See* ECF 74-3 at 34.)

## IV.    **MENTOR DOES NOT INFRINGE**

Notwithstanding ESD's unsupported allegations of inventiveness and possibly copying (*see* ESD Br. at 1–3), Mentor's algorithms do not use the claimed math. This may explain why ESD urges the Court not to explain the claims to the jury. Mentor asks the Court to construe each disputed term/phrase to ensure that the jury understands what these claims cover.


 Dated: October 26, 2018                                Respectfully submitted,

                                                        s/ *John D. Vandenberg*
                                                        Salumeh R. Loesch
                                                        salumeh.loesch@klarquist.com
                                                        John D. Vandenberg
                                                        john.vandenberg@klarquist.com
                                                        KLARQUIST SPARKMAN, LLP
                                                        121 S.W. Salmon Street, Suite 1600
                                                        Portland, Oregon  97204
                                                        Telephone:  (503) 595-5300

                                                        Frank C. Cimino
                                                        FCCimino@Venable.com
                                                        Megan S. Woodworth
                                                        MSWoodworth@Venable.com
                                                        **VENABLE LLP**
                                                        600 Massachusetts Ave. N.W.
                                                        Washington, D.C. 20001
                                                        Telephone: (202) 344-4000
                                                        Facsimile: (202) 344-8000

Melissa R. Smith
State Bar No. 24001351
melissa@gillamsmithlaw.com
**GILLAM & SMITH, LLP**
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257

*Counsel for Defendant Mentor Graphics Corp.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on October 26, 2018 a true and correct copy of the

above and foregoing document was electronically filed in compliance with Local Rule CV-

5(a)(3). As such, this document was served on all counsel who have consented to electronic

service.

*/s/ John D. Vandenberg*